IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

ANITA LOUISE HICKS,

      Plaintiff,

    v.                            Case No.14-1082-RDR

CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,

      Defendant.

**MEMORANDUM AND ORDER**

On April 23, 2008, plaintiff filed an application for social security disability insurance benefits. She alleged a disability onset date of May 31, 2003.[1]   A hearing was conducted upon plaintiff's application on June 16, 2009.   The administrative law judge (ALJ) considered the evidence and decided on August 17, 2009 that plaintiff was not qualified to receive benefits.   This decision was adopted by defendant.   It was reversed and remanded by this court in 2011.   Another hearing was conducted by a successor ALJ on June 28, 2012.   A decision to deny benefits was rendered on August 16, 2012.   This case is now before the court upon plaintiff's motion to reverse and remand the second decision to deny plaintiff's application for benefits.   Plaintiff offers

---

[1] Plaintiff also filed an application for benefits on July 21, 2005.   This application was denied initially on October 12, 2005 and plaintiff did not pursue the matter further.   The parties have argued as to whether the doctrine of administrative res judicata precludes any recovery of benefits for the period prior to October 12, 2005.   Res judicata was not raised during the administrative proceedings to the court's knowledge.   Here, because the court rules that plaintiff's claim for benefits should be denied on other grounds, it is not necessary for the court to decide the res judicata issue.

numerous arguments to reverse the successor ALJ's decision to deny benefits.  Upon careful consideration, the court concludes that the ALJ applied the proper legal standards and that his decision is supported by substantial evidence.

I.  STANDARD OF REVIEW

To qualify for disability benefits, a claimant must establish that he or she was "disabled" under the Social Security Act, 42 U.S.C. § 423(a)(1)(E), during the time when the claimant had "insured status" under the Social Security program.  See Potter v. Secretary of Health & Human Services, 905 F.2d 1346, 1347 (10th Cir. 1990); 20 C.F.R. §§ 404.130, 404.131.  To be "disabled" means that the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

The court must affirm the ALJ's decision if it is supported by substantial evidence and if the ALJ applied the proper legal standards.  Rebeck v. Barnhart, 317 F.Supp.2d 1263, 1271 (D.Kan. 2004).  "Substantial evidence" is "more than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id., quoting Richardson v. Perales, 402 U.S. 389, 401 (1971).  The court must examine the record as a whole, including whatever in the record fairly detracts from the weight of the defendant's decision, and on that basis

decide if substantial evidence supports the defendant's decision. Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994) (quoting Casias v. Secretary of Health & Human Services, 933 F.2d 799, 800-01 (10th Cir. 1991)). The court may not reverse the defendant's choice between two reasonable but conflicting views, even if the court would have made a different choice if the matter were referred to the court de novo. Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting Zoltanski v. F.A.A., 372 F.3d 1195, 1200 (10th Cir. 2004)).

II.  THE ALJ'S DECISION (Tr. 411-425).

There is a five-step evaluation process followed in these cases which is described in the ALJ's decision. (Tr. 412-413). First, it is determined whether the claimant is engaging in substantial gainful activity. Second, the ALJ decides whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments which are "severe." At step three, the ALJ decides whether the claimant's impairments or combination of impairments meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Next, the ALJ determines the claimant's residual functional capacity and then decides whether the claimant has the residual functional capacity to perform the requirements of his or her past relevant work. Finally, at the last step of the sequential evaluation process, the ALJ determines whether the claimant is able to do any other work considering his or her residual functional

3

capacity, age, education and work experience.  In steps one through four the burden is on the claimant to prove a disability that prevents performance of past relevant work.  Blea v. Barnhart, 466 F.3d 903, 907 (10th Cir. 2006).  At step five, the burden shifts to the Commissioner to show that there are jobs in the economy with the claimant's residual functional capacity.  Id.

In this case, the ALJ decided plaintiff's application should be denied on the basis of the fifth step of the evaluation process. The ALJ determined that plaintiff maintained the residual functional capacity to perform jobs that exist in significant numbers in the national economy.

The ALJ made the following specific findings in his decision. First, plaintiff meets the insured status requirements for Social Security benefits through December 31, 2008.  Second, plaintiff did not engage in substantial gainful activity after May 31, 2003, the alleged onset date of disability, through her date last insured. Third, plaintiff has the following severe impairments: degenerative disc disease of the cervical spine; left shoulder impingement; fibromyalgia; hypothyroidism; obesity; and adjustment disorder with depressed mood.  Fourth, plaintiff does not have an impairment or combination of impairments that meet or medically equal the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Fifth, plaintiff has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) to

include lifting or carrying up to 20 pounds occasionally and 10 pounds frequently, consistent with the following limitations:

> [t]he claimant could occasionally climb stairs, but never ladders, ropes or scaffolds.  She could frequently balance, stoop, kneel, bend and crouch but never crawl.  She could occasionally reach overhead with both arms. She should avoid concentrated exposure to cold, wetness, humidity and any exposure to unprotected heights.  The claimant had the ability to understand and remember simple instructions; maintain concentration persistence and pace in order to complete simple tasks; and adapt to changes in a normal work environment.

(Tr. 416).  Finally, the ALJ determined that plaintiff was unable to perform any past relevant work, but that she was capable of performing the following examples of substantial gainful employment:  inserting machine operator; collator operator; injecting mold machine tender; and bonder of electronic components. The ALJ based this conclusion in part upon answers given by a vocational expert.


III.  THE SUCCESSOR ALJ'S RESIDUAL FUNCTIONAL CAPACITY FINDINGS ARE LEGALLY VALID AND SUPPORTED BY SUBSTANTIAL EVIDENCE.

Plaintiff presents a large array of uncaptioned arguments in support of a broadly-stated claim that the ALJ erroneously determined plaintiff's residual functional capacity (RFC).  Many of plaintiff's arguments relate to the evaluation of various doctor's opinions.

A.  The successor ALJ properly analyzed the medical opinion evidence in this case.

The factors for assessing for assessing the weight of medical opinions are cited at 20 C.F.R. § 404.1527. These factors are: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. The regulations provide that "[t]he better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. § 404.1527(c)(3).

In this instance, the ALJ frequently commented upon a lack of objective findings in support of plaintiff's physical limitations. This is a permissible basis for an ALJ to discredit a medical opinion. See DeFalco-Miller v. Colvin, 520 Fed.Appx. 741, 746 (10th Cir. 4/9/2013).

1. Dr. Murati

Plaintiff asserts that the ALJ improperly rejected the opinion of Dr. Pedro Murati. Dr. Murati examined plaintiff on May 20, 2003, which appears to be about the time plaintiff stopped working. Plaintiff complained to Dr. Murati of neck pain, low back pain, knee pain, right hip pain, and pain in her shoulders, arms, wrists

6

and hands. (Tr. 234). She also complained of numbness in her hands and arms, but not in her legs. Id. Dr. Murati diagnosed plaintiff with: low back pain secondary to radiculopathy; cervical radiculopathy; bilateral SI joint dysfunction; bilateral carpal tunnel syndrome; left shoulder pain secondary to rotator cuff partial tear; right shoulder pain secondary to rotator cuff strain or tear; myofascial pain syndrome affecting the bilateral shoulder girdles and cervical spine; and bilateral patellofemoral syndrome. (Tr. 235-36). Dr. Murati indicated that these diagnoses were a direct result of a work-related injury that occurred on April 1, 1998 during plaintiff's employment with Cessna Aircraft Company. (Tr. 236). He noted that he had evaluated plaintiff after her April 1998 injury and that plaintiff reported that her pain had worsened since then, but she had not received any type of treatment.

Dr. Murati released plaintiff to perform sedentary work with "temporary" restrictions which limited plaintiff to no above-shoulder work, no repetitive foot controls, no climbing ladders or stairs, and no squatting, crawling or kneeling. (Tr. 238). There no was end date placed on the restrictions, only until "further notice."

The ALJ commented in his decision that plaintiff worked at a light exertional level since her 1998 injury. Plaintiff contends that this misrepresents plaintiff's actual work activities and does not account for plaintiff's testimony that her physical condition

worsened after 1998.   The court rejects this criticism.   The ALJ
referred to a vocational evaluator's analysis of plaintiff's job as
a part order and stock clerk (Tr. 223) to support his conclusion
that plaintiff worked at a light exertional level.     Plaintiff
fails to rebut this point.   While plaintiff refers to her testimony
that she was given special accommodations at work which were not
accounted for by the ALJ, this evidence is so vague that it does
not vitiate the reasonableness of the ALJ's findings. As for
plaintiff's report to Dr. Murati that her condition had worsened
progressively since April 1998, this comment does not prove that
plaintiff was disabled from light work or other work.    Plaintiff
did not leave work because of her pain or injuries.   The ALJ found
(and plaintiff testified) that plaintiff was laid off work in May
2003.  (Tr. 417, 463).   Thus, plaintiff continued to work at a job
that was classified as light exertion in spite of her pain.

      In any event, the ALJ did not appear to reject Dr. Murati's
opinion on the grounds that plaintiff engaged in light-exertion
employment.   Instead, the ALJ relied primarily upon the fact that
Dr. Murati's restrictions were temporary.    (Tr. 417, 421).
Plaintiff does not dispute this.

      Rather, plaintiff contends that although the limitations were
temporary, they were intended to continue until it was determined
whether plaintiff's condition improved after implementing Dr.
Murati's treatment recommendations.   As plaintiff claims she was
not able to afford treatment, plaintiff contends that the ALJ

should have concluded that Dr. Murati's limitations continued indefinitely.  Thus, plaintiff asserts that the ALJ erroneously speculated about the duration of Dr. Murati's limitations.

Plaintiff's argument itself, however, is based upon speculation.  Plaintiff does not know what Dr. Murati would have concluded regarding plaintiff's restrictions if he had conducted a later examination.  Dr. Murati's recommendations after his May 2003 examination include conservative treatment, physical therapy, and anti-inflammatory and pain medication as needed.  Plaintiff seems to have followed these recommendations at least in part.  The record indicates that plaintiff stopped working, limited her activities, had some physical therapy and used some over-the-counter pain medication.

The ALJ did not make assumptions about plaintiff's condition, he made findings based upon various medical opinions and other evidence in the record, most of which post-dated Dr. Murati's examination.  This evidence provides a reliable basis upon which to determine whether Dr. Murati's restrictions would have continued indefinitely.  The court finds that the ALJ's analysis is reasonable on the whole and with particular respect to Dr. Murati's report, which as the ALJ found, listed temporary limitations upon plaintiff's functional capacity.

2.  Dr.Stein and Dr. Winkler

Dr. Paul Stein, who is board certified in neurological surgery, examined plaintiff on August 1, 2003.  He took note of

9

"multiple areas of complaint," mainly of pain to the neck, upper back and upper extremities. (Tr. 241, 244). Dr. Stein concluded that plaintiff had "some element of cumulative trauma syndrome" with tendonitis which accounted for plaintiff's pain. (Tr. 241). But, several objective tests rendered negative findings and Dr. Stein estimated that plaintiff had only a 3% whole person impairment. (Tr. 240). He advised that plaintiff avoid repetitive activity of the upper extremities (no more than one time per minute for more than two hours in an eight-hour workday or continuous keyboarding for more than one hour at a time or more than two hours in a workday). (Tr. 240). Even with such limits, Dr. Stein indicated that plaintiff's prognosis was "guarded." (Tr. 241).

The ALJ gave Dr. Stein's opinion "little weight" because of the "minimal objective findings," noting for example that there was no loss of range of motion, no muscular spasm, no neurological deficit, and that plaintiff stated that she took Tylenol for discomfort once a week. (Tr. 418). The ALJ also noted that plaintiff did not claim numbness or tingling during her examination by Dr. Stein in 2003, although she testified that her legs went numb in 2009. Id.

Plaintiff criticizes the ALJ's findings, first, by asserting that the six-year passage of time could explain the numbness plaintiff claimed during her 2009 testimony that apparently was not present in 2003 when she saw Dr. Stein. This may be true. But, this discrepancy in the reports of leg numbness does not appear to

have been important to the ALJ's analysis of Dr. Stein's evaluation. Rather, the ALJ emphasized the absence of objective findings supporting upper extremity restrictions. The ALJ referred to the testimony of Dr. Anne Winkler to buttress this conclusion. This leads to plaintiff's second criticism of the ALJ's analysis of Dr. Stein's opinion. Plaintiff charges that the ALJ misrepresented Dr. Winkler's opinion.

The ALJ gave "considerable weight" to Dr. Winkler's opinion. (Tr. 422). Dr. Winkler is board certified in internal medicine and rheumatology. She did not conduct a physical examination of plaintiff, but she reviewed plaintiff's medical records in preparation for her testimony in June 2012. The physical limitations she recommended were adopted by the ALJ to a substantial degree. Cf., Tr. 443-44 and 416. These limitations incorporated some repetitive function restrictions. For instance, Dr. Winkler indicated that plaintiff should only reach overhead occasionally. (Tr. 444). But, Dr. Winkler did not adopt Dr. Stein's opinion as to repetitive use damage. She believed that what Dr. Stein labeled as repetitive use damage or cumulative trauma syndrome was more likely fibromyalgia. (Tr. 457). Dr. Winkler did not characterize Dr. Stein's repetitive use restrictions as "unreasonable," (Tr. 458), or deny that the restrictions "might be reasonable," (Tr. 456), but she did not advocate for those restrictions. (Tr. 458).

Plaintiff alleges that the ALJ misrepresented Dr. Winkler's opinion as to Dr. Stein's restrictions, but the court does not agree. Dr. Winkler stated that she was a "little surprised" about the repetitive motion limitations listed by Dr. Stein (including limitations as to keyboarding) because of the absence of physical findings (including negative tests for carpal tunnel) and because areas which were tender, such as the neck and shoulder area, would not be affected by keyboarding. (Tr. 447-48). The ALJ stated that: "Dr. Winkler testified she was surprised Dr. Stein limited repetitive activity of the upper extremities since the physical findings on examination were pretty much normal other than some tenderness." (Tr. 422). This is not a significant misrepresentation of Dr. Winkler's testimony. Dr. Winkler's characterization of the repetitive use limitations as reasonable or not unreasonable is not determinative because there may be more than one reasonable view of what plaintiff's limitations are. The issue is whether there is substantial evidence in support of the limitations stated by the ALJ. The ALJ's limitations are supported by the testimony of Dr. Winkler and by the objective findings in this record. The reasonableness of Dr. Stein's viewpoint does not mandate a reversal of the decision to deny benefits.

Next, plaintiff contends that Dr. Winkler and the ALJ did not effectively address Dr. Stein's conclusion that plaintiff suffered from both fibromyalgia and cumulative trauma (or repetitive use) syndrome and, therefore, failed to consider the effect or combined

12

effect of all of plaintiff's impairments.  The court rejects this line of argument for the following reasons.  First, Dr. Stein did not conclude that plaintiff suffered from both fibromyalgia and cumulative trauma syndrome.  Dr. Stein only diagnosed cumulative trauma syndrome.  Second, the ALJ clearly did not ignore Dr. Stein's report or the general issue of whether plaintiff's symptoms were caused by fibromyalgia or cumulative trauma syndrome.  (Tr. 422-23).  The ALJ not only addressed Dr. Stein's original report, but also addressed a rejoinder Dr. Stein gave to Dr. Winkler's testimony.  (Tr. 423).  The ALJ sided with Dr. Winkler's view that plaintiff's symptoms were better explained by fibromyalgia than cumulative trauma syndrome.  The ALJ noted that Dr. Winkler was more persuasive not only because of her credentials in rheumatology but also because she had access to all of plaintiff's medical records, including other records which diagnosed plaintiff with fibromyalgia.  Dr. Stein did not have access to all of plaintiff's medical records and had only examined plaintiff once in 2003.

Plaintiff argues that the ALJ erred by assigning more weight to the opinion of Dr. Winkler, who did not examine plaintiff, than to the opinion of Dr. Stein who did examine plaintiff.  As plaintiff notes, the regulations provide a presumption that an examining medical source is entitled to more weight than a non-examining source.  See 20 C.F.R. 404.1527.  But, this presumption may be overridden by a consideration of such factors as consistency with other medical opinions and medical evidence and familiarity

13

with other information in the case record.   See Chapo v. Astrue,
682 F.3d 1285, 1291 (10th Cir. 2012)("An opinion found to be an
examining [opinion] . . . may be dismissed or discounted . . . on
an evaluation of all of the factors set out in the cited
regulations and the ALJ must provide specific, legitimate reasons
for rejecting it").   The ALJ did not act unreasonably in overriding
the presumption in this instance.

Plaintiff asserts that Dr. Winkler did not affirmatively
dispute the cumulative trauma diagnosis.   But, she testified as
follows:

"Q.   Is it your testimony that Dr. Stein's finding of
repetitive use injury - - well do you disagree with that
diagnosis?
A.   There really wasn't much in the way of physical
findings or other findings such as EMG/NCV, x-rays,
anything like that which would necessarily support or
deny that, I mean it's pretty negative.   It's certainly
possible that there was some evidence of repetitive use,
however, when you also have a diagnosis of fibromyalgia,
which she did later on, that can also cause these
symptoms that have sometimes been described as repetitive
use problem.   So it makes it a little unclear.
. . . .
[T]he whole repetitive use injury is not really expected
[as a diagnosis] any more in terms of specialists and
experts.   So most of the time now they're actually
telling people that they found that really more with
fibromyalgia.   So I'm not sure I could say what it might
be otherwise. . . . [Y]ou know the whole concept of
repetitive motion is not - - well I guess the best thing
to say is it's pretty controversial at this point and
many occupational medicine physicians are feeling that
that is not really on ongoing issue, repetitive use, but
that may be because of the acceptance of fibromyalgia as
a diagnosis.
Q. If she did have some - - I mean you're not denying a
person can't have trauma from repetitive use are you?
A.   Usually if there's trauma from repetitive use you
would find things like you know tendonitis, bursitis,

14

ligament tears, osteoarthritis, those kind of things.
What I'm saying is that it is not typical now for
occupational medicine physicians to feel that there is
such a concept of repetitive use damage.  Again it's
somewhat controversial . . . but it is becoming more
typical . . . to indicate someone has fibromyalgia rather
than repetitive use and not to have as you asked both.
Q.  So you think in retrospect the more likely cause of
the difficulty that Dr. Stein was observing was
fibromyalgia?
A.  That would be my best guess, again I'm somewhat
limited."

(Tr. 455-57).  We construe this testimony as disputing the
cumulative trauma diagnosis.[2]

The ALJ's conclusions do not accord with plaintiff's view of
the case.  But, we are confident that the ALJ, contrary to
plaintiff's contention, gave full consideration to all of
plaintiff's impairments.  He reasonably attributed plaintiff's pain
to fibromyalgia, left shoulder impingement, and moderate cervical
disc disease, instead of cumulative trauma syndrome.  (Tr. 422).

The ALJ dismissed Dr. Stein's rejoinder to Dr. Winkler's
testimony as "speculative, suggesting what could have happened."
(Tr. 423).  Plaintiff claims this criticism was unfair and
ambiguous.  We do not share this criticism.  Dr. Stein's rejoinder
is a short statement with references to "if" plaintiff had

---

[2] Plaintiff argues that Dr. Winkler and the ALJ overlooked Dr. Stein's finding
that plaintiff had "cumulative trauma syndrome with tendonitis." (Tr. 241).  This
finding may be related to Dr. Stein's observation that plaintiff had full range of
motion in her shoulders, "but accompanied by some complaints of discomfort" and
that she had "tenderness in the neck and trapezius muscles as well as some
tenderness" in the upper arm and elbow areas.  (Tr. 240-241).  As already stated,
we believe it is clear that Dr. Winkler and the ALJ considered Dr. Stein's opinion
and findings.  While neither Dr. Winkler nor the ALJ specifically referenced Dr.
Stein's tendonitis finding and while that finding, according to Dr. Winkler, would
be consistent with the cumulative trauma diagnosis, we are not convinced that this
omission means that either Dr. Winkler's opinion or the ALJ's order lacks
reasonable support in the record.

fibromyalgia and cumulative trauma syndrome; what "if" repetitive trauma is not stopped early enough; and that tendonitis "can" be permanent.   (Tr.  810-11).   Thus,  there  is  some  degree  of speculation in the statement.  But, as already noted, this was not the only reason or even the primary reason for the ALJ giving little weight to Dr. Stein's opinion and considerable weight to the opinion of Dr. Winkler.   The court acknowledges the comments made by Dr. Stein in response to Dr. Winkler's testimony.   The court also acknowledges Dr. Stein's experience in dealing with cumulative trauma syndrome.   Nevertheless, we find that the ALJ had adequate grounds to side with Dr. Winkler.

3. Dr. Wilkinson

Dr.  Larry  Wilkinson  saw  plaintiff  in  September  2003. Plaintiff complained of neck pain and bilateral pain in the upper extremities.   She also mentioned back pain and numbness of the hands, arms, legs or feet.   Plaintiff was told that she could return to work with restrictions upon repetitive upper extremity activity.   A functional capacity examination (FCE) was ordered. The specialists in charge of the FCE wrote that plaintiff did not always demonstrate good effort and limited her activities "using her perception of restrictions given by a physician."  (Tr. 252). They observed that plaintiff walked with a strange gait (Tr. 253 & 254), which is inconsistent with the observations made during other examinations  (e.g.,  Tr.  242,  302).   They  also  reported  that plaintiff complained of pain when no pain behaviors were observed.

16

On October 20, 2003, based upon the FCE report, Dr. Wilkinson concluded that plaintiff should not kneel or reach overhead; that plaintiff should only occasionally bend, stoop, climb stairs or ladders; and that plaintiff should only occasionally engage in fine hand manipulation and simple grasping. (Tr. 250). He also concluded that plaintiff should avoid repetitive activity (no more than 1 repetition per minute) with her upper extremities. Id. His objective findings during the October 20, 2003 examination were that plaintiff had full range of motion in her neck; a negative axial compression test; normal bilateral abduction of the shoulders, but slow; and no atrophy of the muscles in plaintiff's hands. (Tr. 249).

The ALJ gave Dr. Wilkinson's restrictions "little weight" on the grounds that they were not supported by objective signs or pain behaviors and plaintiff did not give her best effort during the FCE. (Tr. 421).

Plaintiff contends that the ALJ erred in his consideration of Dr. Wilkinson's opinion. Plaintiff asserts that it was improper for the ALJ to rely upon the FCE examiner's observations of "self-limiting" behavior and lack of "good effort" because the FCE examiner was not aware of the restrictions placed on plaintiff and the possible medical grounds for the restrictions. Regardless of the alleged absence of this knowledge, the examiner noted a lack of effort and self-limiting behavior. This could impact the reliability of the results and fail to measure what plaintiff's

17

limitations were at that time because plaintiff would not attempt to exceed restrictions imposed previously.

Next, plaintiff contends that the ALJ's reference to the absence of objective signs and findings in support of Dr. Wilkinson's conclusions is substituting the ALJ's own medical judgment in place of Dr. Wilkinson's judgment and that of the FCE examiner. But, an ALJ is obliged to assess a medical opinion in light of its support or lack of support by relevant evidence and the consistency between the opinion and the record as a whole. The ALJ made this assessment by reviewing the various medical opinions in the record and giving substantial weight to Dr. Winkler's opinion and her review of plaintiff's medical records.

The circuit court cases cited by plaintiff to support her argument that an ALJ may not substitute his own medical judgment for that of a medical source are distinguishable. In Winfrey v. Chater, 92 F.3d 1017, 1022 (10th Cir. 1996), the ALJ made a judgment that the results of a MMPI-2 test were not an adequate basis upon which to make a diagnosis of a somatoform disorder. The judgment was made by a clinical psychologist who had examined the claimant twice. In Miranda v. Barnhart, 205 Fed.Appx. 638, 640-41 (10th Cir. 8/11/2005), the ALJ "second-guessed" an examining clinical psychologist's assessment of a patient's inconsistent, subjective statements. The court noted that the practice of psychology is necessarily dependent upon evaluating a patient's subjective statements. In Valdez v. Barnhart, 62 Fed.Appx. 838, 842-43 (10th

Cir. 2/20/2003), the court held that the ALJ rejected the opinions of treating and examining psychologists in favor of a non-examining psychologist for reasons which were inconsistent and not supported in the record. Again, in the context of a psychological evaluation, the court remarked that a patient's complaints are "medical data" which medical professionals should be allowed to assess without being second-guessed by an ALJ. In Miller v. Chater, 99 F.3d 972, 977 (10th Cir. 1996), during the process of discrediting the opinion of a treating physician, the ALJ made the assumption that the claimant would have changed medication if the side effects were as adverse as the claimant described. In Kemp v. Bowen, 816 F.2d 1469, 1475-76 (10th Cir. 1987), the court concluded that the ALJ "totally ignored all of the medical evidence" relating to the claimant's ability to perform sedentary work. In all of these cases, the ALJs made judgments contrary to medical opinions in the record without corresponding support from other medical opinions in the record. In some of the cases, the ALJs departed from the medical opinions of treating doctors. Here, the ALJ has assessed medical opinions from non-treating physicians in accordance with factors set out in the regulations, and his assessments are supported with medical opinions from other doctors and objective evidence in the record. This is not a situation where an ALJ substituted his opinion or second-guessed the

conclusion of a medical source without support in the record for the ALJ's conclusion.[3]

Plaintiff charges the ALJ with failing to consider the details of the FCE report, but plaintiff does not demonstrate that such is the case.[4] Moreover, it is not critical that the ALJ discuss every facet of each medical report. Plaintiff also asserts that the ALJ relied upon the FCE to discredit Dr. Wilkinson's report. This does not seem unreasonable. Dr. Wilkinson's report expressly states that the restrictions he ordered were based on the FCE. (Tr. 249).

### 4. Dr. Siemsen

Dr. Gerald Siemsen, acting as a medical consultant, completed a physical residual functional capacity assessment on November 7, 2008. He concluded that plaintiff could lift 20 pounds occasionally and 10 pounds frequently and that plaintiff's ability to push and/or pull was unlimited. In general, the exertional and postural limitations he listed were similar, but somewhat less restrictive, than those adopted by the ALJ. (Tr. 338-39). With regard to manipulative limitations, Dr. Siemsen concluded that plaintiff was limited to no rapid repetitive movement. (Tr. 340). His assessment reported that plaintiff had normal gait and station and good strength; that she showed no atrophy in muscles or signs

---

[3] This distinguishes this case from Hatfield v. Apfel, 1998 WL 160995 *7 (D.Kan. 3/3/1998) which is also cited by plaintiff.
[4] Plaintiff also alleges that the ALJ did not properly consider that Dr. Murati and Dr. Wilkinson both limited plaintiff to 10 pounds for frequent lifting. We do not believe plaintiff has established this point. The ALJ's discussion of the evidence indicates that he considered the reports of Dr. Murati and Dr. Wilkinson and therefore was familiar with the limits each doctor placed upon plaintiff's physical activity.

of severe discomfort; that the severity of pain she reported was not credible; and that past records showed limited cooperation with medical sources.  (Tr. 342).  Dr. Siemsen stated that the reports of Dr. Murati, Dr. Wilkinson and Dr. Stein were significantly different from his conclusions and that he gave the reports of Dr. Wilkinson and Dr. Stein partial weight.  (Tr. 343).  The ALJ gave Dr. Siemsen's report some weight, but did not find the manipulative limitation warranted by Dr. Stein's objective findings.  (Tr. 422).

Plaintiff contends that the ALJ did not consider that Dr. Siemsen's opinion regarding a rapid repetitive movement limitation agreed with Dr. Stein's opinion.  We reject this assertion.  The ALJ referenced Dr. Stein's findings in explaining why he did not give weight to the manipulative limitation recommended by Dr. Siemsen.  The ALJ was obviously aware of, but decided to reject for lack of objective findings, the manipulative limitations given by Dr. Stein and Dr. Siemsen.

B.   The successor ALJ properly analyzed plaintiff's credibility.

Plaintiff's second major area of attack concerns the ALJ's credibility findings.  We hold that the credibility findings are supported by substantial evidence and that they do not warrant reversing the decision to deny benefits.

1.   The ALJ's credibility findings.

The ALJ determined that plaintiff's allegations of pain and limitation are credible to the extent that she is limited to  work

at the light exertional level described in the ALJ's formulation of
plaintiff's RFC.  (Tr. 417).  In assessing plaintiff's credibility,
the ALJ stated that he considered:  1) plaintiff's activities of
daily living; 2) the location, duration, frequency, and intensity
of pain or other symptoms; 3) precipitating and aggravating
factors; 4) the type, dosage, effectiveness, and side effects of
medications taken to alleviate pain or other symptoms; 5)
treatment, other than medication, for relief of pain or other
symptoms; 6) any measures other than medication used to relieve
pain or other symptoms; and 7) any other factors concerning
functional limitations and restrictions due to pain or other
symptoms produced by medically determinable impairments.  (Tr.
420).  This is in accord with Social Security Ruling 96-7p, 1996 WL
374186 at *3.

Specifically, the ALJ concluded that plaintiff's description
of severely limited activities, despite having four children living
with her, was not supported by the medical records and abilities
she demonstrated during examinations.  He considered this
negatively as to plaintiff's credibility.  The ALJ also noted that
the records showed little in the way of treatment even considering
plaintiff's lack of insurance and resources.  Further, the ALJ
remarked that plaintiff testified she received unemployment for a
year and a half after she was laid off her job in May 2003 and that
to receive such benefits she had to certify that she was able and
willing to work full time.  The ALJ commented, in addition, that

22

plaintiff was not forthright about all of her income and that plaintiff was reported to have said in September 2011 that she was told not to look for a job until she knew about her social security.

    2.  <u>Review standards for credibility findings.</u>

Generally, credibility determinations are the function of the ALJ and such determinations are not overturned "when supported by substantial evidence." <u>Wilson v. Astrue</u>, 602 F.3d 1136, 1144 (10th Cir. 2010)(interior quotations and citations omitted). This is an "on-balance" analysis. Substantial evidence may exist even when some aspects of an ALJ's credibility determination are mistaken. See <u>Pickup v. Colvin</u>, 2015 WL 1515460 *1 (10th Cir. 4/6/2015)(citing <u>Branum v. Barnhart</u>, 385 F.3d 1268, 1274 (10th Cir. 2004)).

When considering claims of disabling pain, an ALJ should consider: 1) whether a pain-producing impairment has been established by objective medical evidence; 2) if so, whether there is a "loose nexus" between the proven impairment and any subjective allegations of pain; and 3) if so, whether considering all the evidence, both objective and subjective, a claimant's pain is in fact disabling. <u>Branum</u>, 385 F.3d at 1273 (interior quotations and citations omitted). In addition to the credibility factors already mentioned, an ALJ may also consider the "'motivation of and relationship between the claimant and other witnesses, and the consistency and compatibility of nonmedical testimony with

objective medical evidence.'" Id. at 1273-74 (quoting Hargis v.
Sullivan, 945 F.2d 1482, 1489 (10th Cir. 1991)).

    3. Consideration of plaintiff's arguments.

Plaintiff makes numerous arguments against the ALJ's
credibility analysis. After due consideration, the court shall
reject these arguments for the reasons which follow.

    a. Fingering and grasping testimony

First, plaintiff asserts that the ALJ should not have
discounted plaintiff's testimony with regard to difficulty with
fingering and grasping on the basis of what plaintiff's counsel
terms a "one-off grip test." Plaintiff's counsel is referring to a
June 2008 examination conducted by Dr. James Henderson. (Tr. 301-
04). Dr. Henderson found that plaintiff had 40 pounds of grip
strength in her left hand and 55 pounds in her right hand and that
plaintiff's dexterity was preserved.[5] (Tr. 302). The court finds
no error in the ALJ's consideration of somewhat inconsistent
examination findings in assessing plaintiff's credibility. The
findings may not directly address plaintiff's testimony that
sometimes she would lose her grip on things. But, the ALJ's
consideration of the findings is not a substantial legal or factual
error.

    b. Absence of treatment

---

[5] He further found: that plaintiff's range of motion was normal for all joints;
plaintiff's motor function was normal; that plaintiff had no difficulty getting on
and off the examining table and only mild difficulty with heel and toe walking;
that plaintiff had only mild difficulty squatting and arising from a sitting
position, and mild difficulty hopping. (Tr. 302-03).

Next, plaintiff asserts that the ALJ did not properly consider plaintiff's efforts or alleged lack of efforts to obtain treatment. Plaintiff suggests the ALJ erred by emphasizing that plaintiff reported taking Tylenol once a week because it was possible that plaintiff needed more pain medication, but was limited in getting prescriptions by a lack of insurance. Plaintiff further notes that she was doing what Dr. Stein recommended, which was decreased activity - - especially repetitive activity. The ALJ <u>did</u> consider plaintiff's lack of insurance and lack of resources, but noted that when plaintiff had access to medical care through a health program in 2007, "not much was done." (Tr. 419). The court believes this assessment of plaintiff's treatment for pain was not done in error, particularly as this was not the only factor the ALJ mentioned in his credibility analysis. See <u>Welch v. Colvin</u>, 566 Fed.Appx. 691, 694 (10th Cir. 2014)(relying upon treatment gaps of approximately one year as well as plaintiff's daily activities); <u>Barnett v. Apfel</u>, 231 F.3d 687, 690 k4 (10th Cir. 2000)(considering paucity of objective medical findings, lack of treatment for 9 months prior to hearing, not taking prescription pain medication); <u>Campbell v. Bowen</u>, 822 F.2d 1518, 1522 (10th Cir. 1987)(deferring to ALJ credibility analysis which noted <u>inter alia</u> the lack of prescribed pain medication and taking aspirin only about once a week).

        c. <u>Epidurals, physical therapy and decreased activity</u>

Plaintiff argues that the ALJ did not consider plaintiff's treatment in the form of two epidural steroid injections and physical therapy. Plaintiff also reiterates that plaintiff followed the course of decreased activity recommended by Dr. Stein. Plaintiff, however, has not established that the ALJ failed to consider these facts. The record is fairly clear that the ALJ considered plaintiff's limited activities. (Tr. 420). Moreover, an ALJ is not required to discuss every piece of evidence in the record; he "must discuss the uncontroverted evidence he chooses not to rely on, as well as significantly probative evidence he rejects." Threet v. Barnhart, 353 F.3d 1185, 1190 (10th Cir. 2003)(quoting Clifton v. Chater, 79 F.3d 1007, 1010 (10th Cir. 1996)). Here, the court does not consider the epidurals and the physical therapy as significantly probative facts. Neither point establishes in the court's mind that the ALJ erred in considering the general absence of treatment over many years when, plaintiff alleges, she was disabled from work by worsening pain.

### d. The Frey test

Plaintiff asserts that the ALJ failed to follow the requirements of the Frey test as described in Thompson v. Sullivan, 987 F.2d 1482, 1490 (10th Cir. 1993). There, the court, quoting Frey v. Bowen, 816 F.2d 508, 517 (10th Cir. 1987), stated:

> [B]efore the ALJ may rely on the claimant's failure to
> pursue treatment or take medication as support for his
> determination of noncredibility, he or she should
> consider "(1) whether the treatment at issue would
> restore claimant's ability to work; (2) whether the
> treatment was prescribed; (3) whether the treatment was
> refused; and, if so, (4) whether the refusal was without
> justifiable excuse."

The Tenth Circuit, however, has not applied the Frey factors where

an ALJ is merely considering "what attempts plaintiff made to

relieve his pain - - including whether he took pain medication - -

in an effort to evaluate the veracity of plaintiff's contention

that his pain was so severe as to be disabling." Qualls v. Apfel,

206 F.3d 1368, 1372 (10th Cir. 2000); see also, Andrews v. Colvin,

2015 WL 225764 *3 (D.Kan. 1/16/2015)(citing Qualls and other

cases).   That is the situation here and therefore the court finds

no error in the ALJ failing to apply the Frey test in his analysis.

### e. Plaintiff's income

Next, plaintiff attacks the ALJ's credibility analysis on the

grounds that the ALJ miscalculated plaintiff's family income for

the relevant period of time.    The ALJ estimated the income as

$36,000.   Plaintiff asserts the correct figure was less by $4,308.

The court finds that this is not a significant error or one which

would establish that substantial evidence does not support the

ALJ's credibility analysis.

Additionally, plaintiff objects to the successor ALJ's

reference to the first ALJ's decision regarding an alleged lack of

forthrightness by plaintiff in answering questions concerning her

income during the first administrative hearing in this matter.  The
successor ALJ stated:

> As noted in the prior decision, when asked what
> income she has had since she last worked in May 2003, the
> claimant was not forthright about all of her income.  She
> appeared reluctant to report death benefits she and her
> sons were receiving, approximately $900 each for herself
> and her two children monthly.  She did not mention until
> later an additional $359 per month she received from the
> State of Kansas for her three grandchildren ages 7, 2 and
> 1.

(Tr. 420-21).  Plaintiff asserts that she was forthcoming and
accurate in her responses, but faced obstacles when the first ALJ
interrupted and changed the topic of his questions.

When an ALJ is present during a claimant's testimony, the
court is particularly inclined to accept his view of plaintiff's
credibility.  See Cordero Min. LLC v. Secretary of Labor, 699 F.3d
1232, 1236 (10th Cir. 2012)(an ALJ's credibility resolutions deserve
great weight to the extent they are based upon the evidence of live
witnesses and the hearing judge had the opportunity to observe
their demeanor); Lax, 489 F.3d at 1089 (an ALJ's credibility
findings deserve special deference because an ALJ is in the best
position to observe the demeanor of witnesses).  In this situation,
however, the successor ALJ was not present during the income
testimony to which he referred in his opinion.  Still, ALJs are
able to consider the credibility judgments of other persons who
have interacted with claimants.  See 20 C.F.R. § 404.1529(c)(3)(in
determining credibility of claimant's allegations of symptoms,
Commissioner considers all evidence presented, including . . .

28

observations by . . . other persons); SSR 06-03p (in reaching disability decision, Commissioner must consider opinions of "other" non-medical sources). This situation does not appear different from one in which an ALJ refers to a third-party opinion regarding plaintiff's credibility. After reviewing the transcript of the first administrative hearing, the court is not convinced that the successor ALJ committed error in referring to the first ALJ's decision. But, even if it was error, the court finds that the ALJ's credibility analysis on balance is supported by substantial evidence.[6]

f. Psychological factors

Plaintiff argues that the ALJ did not properly consider psychological factors which may have impacted plaintiff's perception of pain. The court disagrees for the following reasons. First, the court notes the ALJ did not dispute that plaintiff suffered pain. He found that plaintiff had certain pain-producing conditions, including fibromyalgia. Indeed, because he believed plaintiff's complaints of pain required some credit, he gave only limited weight to an RFC assessment from Dr. Gary Coleman in 2008.[7] (Tr. 421-22). Second, the ALJ's opinion states that he considered

---

[6] Plaintiff also objects to the ALJ's obscure notation (Tr. 421) that claimant mentioned that, as of September 2011, she would be losing income from death benefits she received on behalf of her children. While the point of the ALJ's remark is unclear, this does not persuade the court that the ALJ's credibility analysis lacks substantial support on balance.

[7] Dr. Coleman reported on July 17, 2008 that plaintiff could lift or carry up to 50 pounds occasionally or 25 pounds frequently; that plaintiff had a normal gait and mainly normal range of motion; and that plaintiff had no postural, manipulative or environmental restrictions. (Tr. 328-31).

plaintiff's physical and mental impairments that could reasonably
be expected to produce plaintiff's pain. (Tr. 416-17). Third, the
ALJ gave considerable weight to Dr. Winkler's opinion and noted her
"extensive explanation of the medical evidence in the file to
support her opinion." (Tr. 422). The psychological factors
mentioned by plaintiff were discussed in Dr. Winkler's testimony
regarding fibromyalgia. She noted that plaintiff had two positive
control points which "suggests" there were "psychosomatic
components" to the disease. (Tr. 440). She also testified that it
was appropriate to say that plaintiff had fibromyalgia that
[included] . . . some psychosomatic problems that probably did
affect her as well." (Tr. 441). Dr. Winkler further testified
that when people with fibromyalgia have psychological issues, they
feel more functionally limited and as if they have more pain. (Tr.
452). Our reading of the record persuades the court that the ALJ
considered the psychological components of plaintiff's pain as part
of Dr. Winkler's testimony regarding fibromyalgia.

Plaintiff asserts that the ALJ gave short shrift to complaints
of: changes in sleep pattern, depression, inability to
concentrate, mood changes and insomnia. This argument does not
appear closely tied to the credibility of plaintiff's complaints of
pain. Nor does it reveal a significant flaw in the ALJ's
reasoning. The ALJ referred to the reports of Dr. Molly Allen and
Dr. R.E. Schulman. These reports do not support a finding that
plaintiff's mental status contributes substantially to disabling

30

pain or that her mental status otherwise prevents her from meeting the demands of a workplace.  (Tr. 307-309; 312-24).

In summary, the court is unconvinced that the ALJ did not consider plaintiff's mental impairments in combination with her physical impairments in determining the credibility of plaintiff's claims of pain.  The court finds that the ALJ properly conducted his credibility analysis and that the analysis is supported by substantial evidence.

g. Unemployment benefits

The ALJ found as a part of his credibility analysis that, contrary to plaintiff's claim of inability to work, she testified that she received unemployment benefits for about a year after she was laid off from her last job in May 2003.  The ALJ observed that in order to receive unemployment benefits a claimant must certify that she was able and willing to work full time.  (Tr. 420). Plaintiff contends that the ALJ's conclusion is contrary to agency policy which, plaintiff contends, does not preclude an award of disability benefits when unemployment benefits have been received. The court rejects this argument.  The ALJ mentioned plaintiff's receipt of unemployment compensation as one aspect of his credibility analysis.  He did not condition the denial of benefits on that finding and therefore did not violate the policy described by plaintiff.

Plaintiff also argues that the receipt of unemployment benefits is not a proper factor to consider when assessing

plaintiff's credibility.   But, unemployment compensation has been considered in comparable cases.   E.g., Marrs v. Colvin, 2014 WL 545738 *4 (D.Kan. 2/11/2014); Killian v. Massanari, 2001 WL 1224722 *4 (D.Kan. 9/27/2001); Allen v. Apfel, 54 F.Supp.2d 1056, 1064 n.1 (D.Kan. 1999).   In addition, most recently the Tenth Circuit gave its approval in an unpublished decision:

> "There is an obvious inconsistency between claiming an ability to work for purposes of obtaining unemployment compensation and claim an inability to work for purposes of obtaining social security benefits.   The ALJ was . . . entitled to rely on [claimant's] receipt of unemployment benefits as a reason weighing against the credibility of her claim of a completely disabling impairment."

Pickup, 2015 WL 1515460 at *2.   While there may be some circumstances which diminish or eliminate the significance of this factor, the record before the court does not indicate that the ALJ committed an error in considering plaintiff's receipt of unemployment benefits.   But, if an error was committed, the court would still maintain that the ALJ's credibility analysis is supported by substantial evidence.

Plaintiff suggests that plaintiff may have misremembered and that there is a document (Tr. 122) which indicates that plaintiff did not apply for unemployment benefits.   Upon consideration of the record, the court believes that plaintiff's testimony in two different hearings provides substantial evidence for the conclusion that she did apply for unemployment compensation.   (Tr. 34, 473).

Plaintiff further contends that the record does not contain a certification from plaintiff that she was able and willing to work

or give notice to plaintiff that the ALJ would take administrative notice of such a certification.   The court finds no error on this point.   Plaintiff cites Heckler v. Campbell, 461 U.S. 458, 469 (1983) in support of plaintiff's argument.   The Court in Campbell states that:   "when an agency takes official or administrative notice of facts, a litigant must be given an adequate opportunity to respond."   461 U.S. at 469.   Plaintiff does not indicate that she was denied an adequate opportunity to respond in this instance. She clearly had the opportunity to make exceptions to the ALJ's opinion to the Appeals Council.   The court believes this option would comport with due process.

### h.   Other evidence

Finally, plaintiff asserts that the ALJ ignored factors which supported plaintiff's credibility.   Plaintiff lists, as an example, the doctors' functional capacity estimates which were more restrictive than the ALJ's RFC.   Plaintiff also asserts that the record does not contain comments from doctors that plaintiff exaggerated her symptoms or that plaintiff was a malingerer. Plaintiff also notes that plaintiff received a friend's help with her daily activities.   Plaintiff contends that the ALJ should have expressly considered these points.

The court finds that these criticisms do not warrant reversing and remanding the decision to deny benefits.   The ALJ wrote a thorough order that indicated that he gave careful consideration to

the record.  On balance, the court finds that the ALJ's credibility analysis is legally valid and is supported by substantial evidence.

   C.  The ALJ properly considered the third-party statement.

   A friend of plaintiff completed a third-party statement on plaintiff's behalf.  (Tr. 156).  The third-party statement indicated that plaintiff's activities were limited to walking her granddaughter to school, personal hygiene, and (with assistance) some simple cooking and housekeeping.  In the final paragraph of the "credibility" section of the ALJ's decision, the ALJ commented that a third-party statement from plaintiff's friend generally echoed the statements made in plaintiff's function reports.  This is an accurate characterization.  The ALJ found that the statement lacked support from plaintiff's medical records and therefore gave it little weight. (Tr. 421).

   Plaintiff contends that the ALJ rejected the third-party statement merely because it did not come from a medical source and that this is contrary to this court's holding in Schoonover v. Colvin, 2014 WL 3925503 *7 (D.Kan. 8/12/2014).  We reject this argument.  As already stated, the ALJ in this case gave "little weight" to the third-party statement because it was not supported by plaintiff's medical records.  This is different from rejecting evidence because it does not derive from a medical source as was the case in Schoonover.

   The third-party statements in Schoonover, in part, included observations from college instructors concerning the pain exhibited

34

by the claimant (who was a college student) when he sat during class. The court held that these observations could not be discredited merely because they did not derive from a medical source. Here, the ALJ stressed throughout his decision that medical findings such as normal range of motion, lack of atrophy, absence of pain behaviors and other negative findings were inconsistent with plaintiff's statements and the third-party statement regarding plaintiff's limitations due to pain. The Schoonover case is also distinguishable because there the court found that the ALJ's RFC formulation was not supported by the medical evidence. Here, a reasonable person could find that the ALJ's RFC formulation is supported by medical evidence in the record. The same evidence helps support the ALJ's credibility finding and his conclusions regarding the third-party statement.

IV. CONCLUSION

   For the above-stated reasons, the court shall affirm defendant's decision to deny benefits.

   IT IS SO ORDERED.

   Dated this 24th day of April, 2015 at Topeka, Kansas.

                          s/Richard D. Rogers
                          RICHARD D. ROGERS
                          UNITED STATES DISTRICT COURT JUDGE